**EASTMAN OIL WELL SURVEY COM-PANY, Appellant,**

v.

**A. B. HAMIL, Appellee.**

**No. 15095.**

Court of Civil Appeals of Texas.

Houston.

June 1, 1967.

Rehearing Denied June 22, 1967.

William R. Eckhardt, James R. Bertrand, Houston, Vinson, Elkins, Weems & Searls, Houston, of counsel, for appellant.

Fred C. Brigman, Jr., Houston, Brigman, Martin & Smith, Houston, of counsel, for appellee.

WERLEIN, Justice.

This suit was brought by Eastman Oil Well Survey Company, herein called Eastman, against A. B. Hamil, appellee, to recover the amount allegedly advanced by Eastman for the management and operation of Pipeline Services, Inc., herein called Pipeline, under a contract entered into by Eastman and Pipeline, sometimes referred to as the basic agreement or contract. After beginning the trial the parties waived the jury and submitted all issues of fact and law to the court. From a take-nothing judgment of the court, appellant has duly perfected its appeal.

The agreement between Eastman and Pipeline was entered into on September 27, 1960. Under such agreement Eastman undertook the management and operation of the business of Pipeline, a Colorado corporation chartered on August 23, 1960. The contract provided, among other things, that Eastman would lend such working capital as it deemed necessary and proper in the operation and development of the business of Pipeline, and manufacture at Eastman's cost such equipment as might be required for Pipeline's business and which it might be feasible for Eastman to manufacture with its facilities. Eastman was to receive 20% of the net profits derived from the operation of Pipeline. In the agreement "net profits" was defined as meaning gross sales less all operational costs payable to Eastman under the contract, not including the 20% of the net profits, and less certain other costs. Eastman was

not chargeable with or to participate in any losses. The contract further provided that the agreement was to remain in full force and effect for a period of one year unless sooner terminated by the reorganization of either or both parties thereto, or the mutual agreement of the parties.

The evidence shows that Bill Morrison, president of Pipeline, controlled M.K.Y., an Oklahoma corporation, and that either it or Morrison owned patents covering a pipeline plugging pig, a device used to plug the flow of pipelines in order that the same might be cleaned out or repaired without wasting the contents of the pipeline. It was contemplated that Pipeline would obtain the patent rights from M.K.Y. and that Eastman would undertake the management and operation of Pipeline and advance funds for such management and operation. Philip D. Arterburn, formerly the president of Eastman, testified by deposition that he refused to deliver the executed agreement to Pipeline, which was a new corporation without any assets, without a letter of guarantee from the controlling stockholders of Pipeline. By a letter agreement, A. B. Hamil, Harry T. McClain, Bill Morrison and John H. Lowell, representing themselves to be the controlling stockholders of Pipeline, addressed the following letter guarantee to Eastman under date of September 28, 1960:

Gentlemen:

By agreement dated September 27, 1960 you (Eastman) have undertaken the operation of Pipeline Services, Inc. (Pipeline) as of an effective date of September 1, 1960.

Eastman has and intends to continue to advance funds for the operation of Pipeline according to its agreement with Pipeline.

To date, the reorganization of Pipeline Services, Inc. and M.K.Y. Corporation, the planned predecessor organization of Pipeline, has not been formally effected.

If such reorganization is not in fact effected along with the lending of funds in an amount sufficient to retire the presently existing trade and other obligations of the predecessor organization, the undersigned as controlling stockholders of Pipeline herewith guarantee the return to Eastman of all funds advanced by Eastman for the operation of Pipeline.

When and if such reorganization is effected and the said funds advanced we shall by such action be released from such guarantee.

Very truly yours,
/s/ A. B. Hamil
_____
A. B. Hamil

/s/ Harry T. McClain
_____
Harry T. McClain

/s/ Bill Morrison
_____
Bill Morrison

/s/ John H. Lowell
_____
John H. Lowell

There is evidence that the basic agreement and the letter guarantee were exchanged and delivered simultaneously.

Pipeline was organized to engage in the business of providing pipeline plugging pig service for pipeline owners. The plan contemplated the providing by appellee, A. B. Hamil, and others, of the necessary moneys or credit to retire the obligations of M.K.Y. Corporation, and the acquisition of the plugging pig patent by Pipeline through a reorganization of that corporation with M.K.Y. Corporation, and the use of the nationwide marketing facilities of Eastman for the promotion of sales of the pipeline plugging pig service. No reorganization of Pipeline and M.K.Y. Corporation was ever formally effected, and no funds were advanced to retire the trade and other obligations of M.K.Y.

Just prior to December 7, 1960 Eastman discovered that Morrison had disposed of

the patent rights covering the pipeline plugging pig to a third party, thus making it unavailable to Pipeline. Without the right to the basic patent covering the services which Eastman was providing and agreed to provide, it did not wish to continue the management and operation of Pipeline. By mutual agreement, as provided in the basic contract, it was terminated by letter dated December 7, 1960, signed by Eastman and Pipeline, which reads as follows:

Eastman Oil Well Survey Co.
1450 Speer Boulevard
Denver, Colorado
Gentleman:

Eastman Oil Well Survey Co. (Eastman) and Pipeline Services, Inc. (Pipeline) entered into an agreement dated September 27, 1960, under which Eastman was to manage and otherwise operate the business of Pipeline.

Paragraph 2.7 of the said agreement called for its termination by mutual agreement of the parties. The parties have in fact agreed to terminate the said agreement as of December 7, 1960.

In connection with such termination it is agreed that Eastman shall terminate all further expenditures relative to its agreement with Pipeline and Pipeline shall be responsible to pay only such costs as may be incurred after such termination for salaries or wages required to be paid to employees of Pipeline after notice of termination of employment by applicable state laws. Eastman shall undertake the giving of notices of employment termination to Pipeline personnel.

If the foregoing is in accord with your understanding, please so indicate in the space provided below for that purpose.

Very truly yours,
PIPELINE SERVICES, INC.
By: /s/ Bill Morrison
President

ATTEST:
/s/ Bruce Kistler
Secretary

The foregoing agreement is confirmed and accepted.
EASTMAN OIL WELL SURVEY CO.
By: /s/ P. D. Arterburn
President

ATTEST:
/s/ J. W. McClung
Secretary

In its conclusions of law the trial court found and concluded that the guarantee agreement was unconditionally delivered to Eastman, and that but for the release dated December 7, 1960, Hamil would be obligated by reason of the guarantee agreement to pay Eastman the sum of $36,781.37. The court further found and concluded that the termination agreement of December 7, 1960 did by its terms release Pipeline from

its obligation under its contract to repay Eastman the amount of funds advanced by Eastman for the operation of Pipeline.

Appellant asserts that the trial court erred in construing the termination agreement as a release of appellee Hamil from his contractual obligation to repay to Eastman the amount of the funds advanced by Eastman prior to December 7, 1960 for the operation of Pipeline. It is also appellant's contention that the court erred in overruling its motion for judgment and in entering judgment for appellee because irrespective of whether the termination agreement released Pipeline, it did not release appellee who was primarily liable as a co-obligor to return to Eastman all funds advanced for the operation of Pipeline.

The principal question for determination is whether the termination agreement released Pipeline from its obligation to repay Eastman the amount of $36,781.37 which was advanced by Eastman during the period from September 27, 1960 through December 7, 1960 for the operation of Pipeline in accordance with the basic contract of September 27, 1960. The undisputed evidence shows that Eastman did advance such amount for the operation of Pipeline, and no part of such sum has been repaid. The evidence further shows that appellee and the other joint obligors in such letter guarantee did not pay off the obligations of M.K.Y. Corporation and the reorganization of that company with Pipeline was not accomplished, and that Pipeline had no bank account and no assets. The evidence is not clear as to who prepared the termination agreement. Arterburn testified he did not know, but that he was under the impression that Mr. Kistler, Pipeline's attorney, drew it since he was present at the time it was executed. The evidence shows that Mr. Tull, Eastman's attorney, was also present. The termination agreement, however, is in the form of a letter from Pipeline to Eastman, which fact gives rise to an inference that Pipeline drafted it. There is no pleading or contention by either party that such termination agreement is ambiguous or that it was procured by fraud, accident, or mistake.

■ The evidence is undisputed that appellee was never informed of the intention of Eastman and Pipeline to terminate the basic contract and that he knew nothing about the termination thereof until sometime after the termination agreement had been executed. Appellant takes the position on appeal that even though the court should conclude that the letter guarantee released Pipeline it did not release appellee since he was primarily liable as a co-obligor to return to Eastman all funds advanced for the operation of Pipeline. We do not agree. The instrument itself shows that it is a guarantee on the part of appellee and his co-obligors and not an original promise. It provides that if such reorganization is not effected along with the lending of funds in an amount sufficient to retire the presently existing trade and other obligations of the predecessor organization, such parties as controlling stockholders of Pipeline guarantee the return to Eastman of all funds advanced by Eastman for the operation of Pipeline, and that when and if such reorganization is effected and the said funds are advanced, such parties shall by such action be released from such guarantee.

In its pleading appellant alleges that Hamil and his co-obligors executed their guarantee to Eastman that Eastman would be reimbursed for funds advanced in the event a reorganization of Pipeline and M.K.Y. was not fully and formally effected. Appellant made demand of Pipeline on December 21, 1960 for payment of the amount allegedly due by Pipeline, but made no demand on appellee and his co-obligors for payment of such amount until January 19, 1961. The case was tried on the theory that any liability imposed upon appellee was on the basis of his guarantee as set out in the guarantee agreement.

The termination agreement refers to paragraph 2.7 of the contract which provides for its termination by mutual agreement of the parties, and recites that the parties have agreed to terminate said contract as of December 7, 1960. It then in effect provides: (1) In connection with such termination it is agreed that Eastman shall terminate all further expenditures relative to the contract of September 27, 1960. (2) Pipeline shall be responsible to pay only such costs as may be incurred after such termination for salaries or wages required to be paid to employees of Pipeline after notice of termination of employment by applicable state laws. Thus, it is seen that the termination agreement makes no reference whatever to the indebtedness incurred by Pipeline up to the termination date of December 7, 1960, but does specify that Pipeline shall be responsible for costs that may be incurred after termination for salaries or wages required to be paid after notice or termination of employment by applicable state laws. If it was Pipeline's intention that it should be released from all the indebtedness owing by it prior to December 7, 1960, it would have been a very simple matter to have so provided in unmistakable language in the termination letter addressed by Pipeline to Eastman.

In our opinion, the purpose and intention of the parties as reflected in the termination agreement was to terminate the basic contract by mutual consent, to relieve Eastman from making further expenditures, and to protect Pipeline from any obligation to reimburse Eastman for any expenditures Eastman might make after the date of termination except such costs for salaries and wages as Eastman might be required to pay after termination to employees of Pipeline by applicable state laws. To make sure that Pipeline would not be held liable to pay any costs incurred by Eastman subsequent to the date of termination other than such salaries or wages, the instrument provides that Pipeline shall be responsible to pay only such costs as may be incurred after termination for salaries or wages to Pipeline's employees that Eastman might be required to pay by applicable state laws.

In Portland Gasoline Co. v. Superior Marketing Co., 1951, 150 Tex. 533, 243 S.W.2d 823, the Court referred with approval to a statement made in 12 Am. Jur. 791, Contracts, Sec. 250. We quote a part of that statement in 12 Am.Jur. 792, as follows:

> When the evidence of the agreement furnished by the contract itself is not plain and unmistakable, but is open to more than one interpretation, the reasonableness of one meaning as compared with the other and the probability that men in the circumstances of the parties would enter into one agreement or the other are competent for consideration on the question as to what the agreement was which the written contract establishes.

See also Chester v. Jones, 386 S.W.2d 544, Tex.Civ.App. In Hicks v. Smith, 330 S.W.2d 641, Tex.Civ.App., ref., n.r.e., the court said in effect that under rules of law courts will avoid, where possible and proper, a construction which is unreasonable, inequitable, or oppressive.

In the instant case Eastman on the faith of the guarantee of appellee and his co-obligors, expended $36,781.37, as found by the trial court, for the operation of Pipeline. The failure of Pipeline and its controlling stockholders to accomplish the reorganization of Pipeline with M.K.Y. and to retire the obligations of M.K.Y. was not attributable to Eastman. Eastman advanced the funds in question in the amount found by the court, with the understanding that it would be reimbursed in the event Pipeline and its controlling stockholders failed to retire the existing trade and other obligations of M.K.Y. and to accomplish the contemplated reorganization of Pipeline and M.K.Y. It seems unreasonable that under such circumstances Eastman would agree to release an indebtedness of over $36,000.00 when it was not required to do so. The failure of appellee and his co-obligors and Pipeline to perform their

part of the original basic agreement would have permitted appellant to refuse to advance further funds for costs and given it the right to terminate the agreement regardless of whether Pipeline consented to enter into a mutual agreement of termination. By the sale of the patent rights, M.K.Y. and Morrison made performance by Pipeline impossible, so that further performance by Eastman was not a prerequisite to its right to terminate the basic agreement and sue for reimbursement of the funds it had advanced.

Appellee emphasizes the following statement made by Arterburn in his deposition which was taken in Denver, Colorado, August 27, 1965: "Well, I called a meeting of all the parties so that everyone would understand—not all the parties, here in Denver, John Lowell and his attorney and our people here in Denver—to go over this situation to find out what could be done. Since the patent itself under which we operated, under which Pipeline Services, Inc., had hoped to operate, had been diverted elsewhere by Pipeline Services' own president. I wanted to withdraw from this contract or be reimbursed for what we had expended to date."

■ The foregoing statement by Arterburn was made in his oral deposition which was taken about 4½ years after the termination agreement was entered into. It states at the very most what Arterburn in 1965 thought he had in mind at the meeting on December 7, 1960. Arterburn had sold his stock in Eastman in 1961 and had severed all connections with Eastman in 1963, long prior to the taking of his deposition. There is nothing in the evidence to indicate that any such idea that Arterburn may have entertained mentally was ever expressed at the meeting. Such thought as Arterburn in 1965 thought he had in 1960 was no part of the termination agreement, and even if it had been expressed it would have been merged in the written termination agreement. There is no contention that the termination agreement is ambiguous, hence any idea or thought with respect thereto which Arterburn may have entertained would be completely immaterial to any issue in the case. The same thing may be said with respect to what Eastman's lawyer, Tull, thought when his law firm wrote Pipeline demanding payment by Pipeline of the amount which had been advanced to that company by Eastman. The rule for construing an unambiguous written contract has been stated by our Supreme Court in Ohio Oil Co. v. Smith, Tex.Sup.1963, 365 S.W.2d 621, at 627, as follows:

It is the general rule of the law of contracts that where an unambiguous writing has been entered into between the parties, the courts, in construing that writing will give effect to the intention of the parties as expressed or apparent in the writing. In the usual case, the instrument alone will be deemed to express the intention of the parties for it is objective, not subjective, intent that controls. See: Woods v. Sims, 154 Tex. 59, 273 S.W.2d 617, 620; See generally: Williston on Contracts § 610; Restatement of the Law of Contracts, § 230.

In the application of the foregoing rule it is our view that the intention of the parties as apparent in the termination agreement is as we have hereinabove construed it.

■ Appellee asserts that appellant failed to prove that it had advanced any sums to Pipeline in accordance with the management agreement. We have read the entire statement of facts, and overrule such contention. The trial court found that the funds advanced by Eastman for the operation of Pipeline during the period September 27, 1960 through December 7, 1960, were advanced in accordance with the basic contract and in reliance upon the guarantee made by appellee and his co-obligors, and that the total amount advanced by Eastman was $36,781.37. We are of the opinion that there was ample evidence to support such findings by the trial court.

■ Appellee further contends that there were material alterations made by appellant and Pipeline in the management agreement, and that such alterations released appellee from any liability under the alleged guarantee. The trial court found that the letter guarantee was not dated when executed by appellee, and also that appellee instructed John H. Lowell not to deliver said instrument to Eastman until appellee's stock in Pipeline was delivered. The court found, however, that the letter agreement was unconditionally delivered to Eastman by John H. Lowell and Bruce Kistler, and that no notice was given to Eastman that such agreement was conditionally delivered or that any instructions had been given that the same was to be delivered only under certain conditions. The evidence shows that neither Lowell nor Kistler represented Eastman in any way, and that Lowell was one of the co-obligors of appellee in the letter guarantee, and that Kistler was the attorney for Pipeline and not for Eastman. The law is well settled that a conditional delivery of a guarantee instrument must be brought home to the obligee in order to relieve a guarantor of his obligation expressed in the guaranty agreement which he has signed. Tarlton v. Trezevant & Cochran, 165 S.W.2d 514, Tex.Civ.App. 1942, ref., w.o.m.; Kugle v. Traders' State Bank of Cleburne, 252 S.W. 208, Tex.Civ. App.1923, n.w.h.; Bopp v. Hansford, 18 Tex.Civ.App. 340, 45 S.W. 744, 1898, error ref.

■ The fact that the guarantee agreement was not dated when executed by appellee is immaterial since no date was essential to its validity. Longley v. Caruthers, 1885, 64 Tex. 287; 13 Tex. Jur.2d 224, Contracts, Sec. 78. In Longley the court held that there being no plea of non est factum, and the date of execution of the instrument having been alleged, it was unnecessary to offer parol evidence of its date, and further that no date was essential to the validity of the instrument. The evidence shows that the letter agreement was dated September 28, 1960 when it was delivered to Eastman. In our opinion, there were no material alterations made by appellant and Pipeline in the management agreement. The termination agreement was entered into as provided in the basic contract, and was in accordance with its provisions and not in variance or alteration thereof. There is no evidence of probative force of any non-performance by Eastman of its obligations under the basic contract.

■ Appellee alleged that he had no notice of the termination agreement and was, therefore, deprived of any opportunity to protest or to demand that appellant comply with its agreement, or to take action against the principal obligor. He did not allege or undertake to prove that he would have protested or demanded that appellant comply with the agreement other than was done or that he would have taken any action against Pipeline, the principal obligor. The evidence shows that Pipeline apparently had no assets whatever since the patent and equipment were never assigned or transferred to it. Prior to December 7, 1960, Morrison, who controlled M.K.Y. and was the president of Pipeline, had transferred and assigned the pipeline plugging pig, the patent and all the equipment to another corporation at the behest of one Elmer Harber to whom the same had been previously mortgaged by Morrison. Appellee failed to allege or establish an estoppel, nor did he show that the short time which elapsed between the date of the termination agreement and his receiving notice thereof, in any way prejudiced him in taking action against Pipeline.

■ Appellee also contends that the guarantee agreement never became a binding obligation on him because he was never notified of its acceptance by appellant and he had no knowledge of its having been delivered to appellant in violation of his instructions. No notice of acceptance by appellant was required. The evidence shows that appellant did accept the guar-

antee, and would not have delivered the basic contract but for the fact that contemporaneously with the delivery thereof the guarantee was delivered to it. The guarantee agreement was delivered unconditionally to appellant by one of appellee's co-obligors, John H. Lowell. If any instructions were given Lowell by appellee, Eastman had no notice thereof. "Notice of acceptance is not required if it appears from the expression of an offer of guaranty or the conduct of the offeror in expressing the offer that no notice of acceptance was expected or desired by the offeror." 27 Tex.Jur.2d 295, Guarantee, Sec. 20, and authorities cited. Appellant, who demanded and relied upon the guarantee which was unconditionally delivered to it, and who knew nothing of any private instructions which appellee may have given to his co-obligor, Lowell, was neither requested nor required to notify the controlling stockholders of Pipeline of the acceptance of the letter of guarantee without which the basic agreement would not have been delivered by appellant to Pipeline. No possible reason existed for nonacceptance by Eastman of the guarantee which it had demanded. Furthermore, notice of acceptance of a guarantee is not required except when the guarantee is in the form of an offer or proposal. Johnson v. Bailey, 1891, 79 Tex. 516, 15 S.W. 499; Hill Mercantile Co. v. Rotan Grocery Co., 127 S.W. 1080, Tex.Civ.App.1910, writ dism. In the instant case, the guarantee agreement is not in the form of an offer or proposal. It clearly shows that it is a completed, unconditional guarantee.

Since we have concluded that the termination agreement was not a release of the amount found by the trial court to have been advanced by Eastman for the operation and management of Pipeline down to December 7, 1960, the judgment of the Trial Court is reversed and judgment is rendered in favor of appellant for the sum of $36,781.37.

Reversed and rendered.