**Robert L. HATCHETT, Jr., Appellant,**

v.

**C. W. WILLIAMS, Appellee.**

No. 15387.

Court of Civil Appeals of Texas.

Houston (1st Dist.).

Dec. 30, 1968.

Opinion on Remittitur Jan. 9, 1969.

Rehearing Denied Jan. 30, 1969.

Moore & Morris, Thomas W. Moore, Jr., Houston, for appellant.

William Key Wilde, John R. Cope, Houston, for appellee, Bracewell & Patterson, Houston, of counsel.

PEDEN, Justice.

C. W. Williams filed this suit for damages against Corky's Hong Kong Clothes, Inc., for breach of a contract whereby he was to be paid for supplying all the ready-to-wear clothing to be sold in the corporation's Shreveport, Louisiana, store and against Robert L. Hatchett, Jr. for breach of his guaranty agreement in favor of Williams. A default judgment was entered against Corky's Hong Kong Clothes, Inc. (which we will call Corky's), and it has not filed an appeal. After a jury trial Hatchett has perfected this appeal from the judgment of the trial court in favor of Williams in the amount found by the jury, $15,030.69.

Appellant's points of error assert that the original contract between Williams and Corky's was void because it was in restraint of trade; that the trial court erred in refusing certain special issues submitted by appellant inquiring whether his signing of the guaranty agreement was conditioned on his being joined by a certain other guarantor. Further, that the verdict will not sup-

port the judgment. He also raises points of no evidence, insufficient evidence to support the judgment and asserts that the judgment is against the great weight of the evidence. He presents in the alternative a point that if appellee is to prevail appellant is entitled to an offset of $1,422.31.

The original contract (as it will be called in this opinion) between Corky's and Williams, the appellee, was executed in Shreveport on October 7, 1964. It recited that Corky's was a Texas corporation duly qualified to do business in Louisiana, that Williams was a resident of Caddo Parish, Louisiana, that Corky's owned several stores, one of which was in Shreveport, that sold "made to measure" suits made in Hong Kong and that it would be of considerable financial advantage to Corky's if it had Hong Kong tailored ready-to-wear suits and similar items to sell. Also, that Williams desired to purchase such ready-to-wear items and place them for sale with Corky's. The relevant contract provisions, with emphasis added, were:

"(1) Williams is * * * granted the exclusive right to furnish all merchandise that is sold *in the store known as 'Corky's Hong Kong Clothes', Petroleum Tower, Shreveport, Louisiana,* with the exception of made to measure items of clothing.

"(2) Williams will purchase from time to time items of ready to wear clothing for both men and women. The purchases will be made in Hong Kong or such other place or places as may be mutually agreeable to Corky's and Williams. Williams will cause such items to be shipped to Corky's store in Shreveport, Louisiana, pay all shipping costs and custom tariffs or charges.

"(3) *Upon arrival in Shreveport, Louisiana,* the items will be inventoried; cost of each item to include customs charges and its proportion of all shipping costs. * * * The cost as thus determined, shall be sometimes referred to hereinafter as 'gross cost' * * *.

"(4) *The merchandise will remain the property of Williams until sold to customers or purchased,* as hereinafter provided, by Corky's.

"(5) Williams will maintain an inventory of ready to wear items of not less than FIVE THOUSAND AND NO/100 ($5,000.00) DOLLARS, gross costs. * * * At no time shall such inventory be in excess of TWENTY THOUSAND AND NO/100 ($20,000.00) DOLLARS without the mutual consent of both parties. *Provided, however, that items purchased by Corky's under the ninety (90) day provision shall not be included as a portion of the inventory.* * * *

"(6) With respect to the purchase of the ready to wear items by Williams, it is understood that Corky's shall have the exclusive right and the obligation to select the merchandise and to negotiate the price to be paid the manufacturer or tailor. However, Corky's shall have no general authority to obligate Williams and must have specific authority from Williams for each order to include the maximum amount to be paid the tailor, manufacturer or exporter for the shipment. Williams shall also have the same rights to make such purchases with Corky's consent.

"(7) *Corky's shall have the exclusive right to fix and determine the price at which each item shall be sold.* However, without the expressed authority of Williams, the retail price shall not be less than gross cost plus twenty (20%) percent, which percentage is hereinafter sometimes called the 'mark-up'. *With respect to items purchased by Corky's from Williams under the ninety (90) day provision hereinafter set forth, the sales price shall be at the sole discretion of Corky's.*

"(8) On the first banking day following the date of sale, Corky's shall deposit in The First National Bank in Shreveport to the credit of Williams, an amount equal to the gross cost plus fifty (50%) percent of the mark-up of each item sold. Williams shall be furnished daily with a list of items

sold the previous day together with cost and mark-up of each item, sales slips and bank deposit slip.

"(9) At the request of Williams, Corky's shall purchase and immediately pay for any item received by the store more than ninety (90) days prior to the demand. The purchase price shall be the gross cost plus five (5%) percent. Williams shall have the right to remove any merchandise which he has furnished, which has been in the store for more than ninety (90) days. *At any and all reasonable times, Williams may inventory the merchandise placed in the store under this agreement.* Any items not in the store shall be considered as having been sold as a normal store sale unless the store has been robbed or burglarized and evidence of such robbery or burglary is established.

"(10) In the event a petition is filed for the bankruptcy of Corky's, either voluntary or involuntary, * * * Williams shall have the right to remove all of his unsold items without payment of any kind to Corky's. * * * In the event Williams shall be reasonably apprehensive that the merchandise placed in Corky's store or stores is in jeopardy from the claim of creditors or from poor management, he may call upon Corky's for security acceptable to him. In the event Corky's should fail or refuse to provide such security, Williams may at his option remove the merchandise placed by him in the store and terminate this agreement. * * *

" * * *.

"(12) It is further agreed that at the option of Williams, this contract shall extend to and cover all other retail outlets which Corky's now owns or may acquire during the life of this contract. In such event the gross cost of each item shall be computed at the local store and not the Shreveport, Louisiana store. This option must be exercised within six (6) months from date as to each store or retail outlet now owned by Corky's and within sixty

(60) days after the opening of each new store or retail outlet.

"(13) * * *.

"(14) This contract and agreement shall be and remain in full force and effect for a period of one (1) year from date. Corky's further grants to Williams the option to renew and/or extend this contract * * * for nine (9) additional consecutive periods of one (1) year each, * * *" by his depositing in the Central National Bank at Houston, Texas to the credit of Corky's $1,000.00 for one year's renewal on or before 60 days from the anniversary date of this contract.

Mr. A. L. "Corky" Jackson, president of Corky's, testified that early in 1965 the corporation was in a state of bankruptcy and that he wanted to move to a new Dallas store the merchandise which was on consignment from Williams in the Shreveport store. He asked Williams for permission and Williams agreed to give it provided he received sufficient securities.

Williams' attorney prepared the guaranty agreement. It refers to the original contract summarized above and guarantees that Williams will be paid the gross cost of the merchandise he had placed in Corky's which was valued at $17,772.78, less the gross cost of any merchandise returned to Williams which had been held by Corky's for 120 days or less. The guaranty agreement recites that it was recognized that Williams had the right under paragraph 10 of the original agreement to terminate it and remove the merchandise and be fully protected from loss. The guaranty agreement was executed by appellant, who was a stockholder and director of Corky's, on Feburary 9, 1965 at Houston.

■ It is uncontroverted that the goods purchased under the original contract moved in foreign and interstate commerce. Appellant alleged by proper pleadings that the original contract was in restraint of trade, lessened competition, created a mo-

nopoly and thereby violated the statutes of the United States and of Texas. Also that it was in violation of Louisiana statutes, LSA–R.S. 51:121–51:124, inclusive. It is clear that we must consider the contract subject to the statutes of the United States. As to the applicability of the statutes of the states of Texas and Louisiana, there is nothing in the record which indicates that the parties intended that the contract should be governed by the laws of any state other than the one where it was made, Louisiana.

■■■ "A contract made in one state to be performed partly in one state and partly in another will be governed by the laws of the state where made unless the parties intend otherwise." 12 Tex.Jur.2d 310, Conflict of Laws, § 11; Grace v. Orkin Exterminating Co., Inc., 255 S.W.2d 279 (Beaumont, Tex.Civ.App.1953, writ ref., n. r. e.). Appellee never did exercise his option to place merchandise in any of the Corky's stores other than the Shreveport one; after execution by appellant of the guaranty agreement he only permitted merchandise he had placed in the Shreveport store to be moved to one in Dallas and later to Houston. For these reasons, we do not apply Texas law to determine whether the original contract was, as appellant contends, in restraint of trade, illegal, void, unenforceable and in violation of the antitrust statutes of Texas.

As to the applicability of Louisiana statutes, the ones pleaded and proven by appellant provide in part that 1) contracts in restraint of trade or commerce are illegal, 2) no person shall monopolize or attempt to do so or combine or conspire to monopolize any part of the trade or commerce within this state and 3) no person engaged in commerce shall sell or contract to sell goods for use within this state or fix a price on the agreement that the purchaser shall not deal in the goods of a competitor of the vendor where the effect of the sale or contract for sale is to substantially lessen competition or tends

to create a monopoly in any line of commerce.

Appellant has offered no proof apart from the terms of the original contract itself as to whether its effect is to "substantially lessen competition", as to whether it "tends to create a monopoly" or as to whether it is "in restraint of trade or commerce", so we look to the contract alone for this determination.

Item 6 of the contract provided that Corky's shall have the exclusive right to select the merchandise while giving Williams control over the maximum amount to be paid for it. It did not restrict the brands of merchandise to be sold. At most it merely granted to appellee an exclusive right to supply whatever ready-to-wear merchandise Corky's chose to offer for sale in its Shreveport store and to do so over a one year period with option to renew the contract for nine additional periods of one year each. Even if Williams had exercised his other option to extend the agreement to Corky's other stores the provisions of the original contract would neither lessen competition nor tend to create a monopoly. New Orleans Cigarette Service Corp. v. Sicarelli, 73 So.2d 339 (Ct.App.La., 1954), citing 17 C.J.S. Contracts § 255, p. 1151.

■■ "If the natural tendency or probable effect of the combination or monopoly is the restraint of trade by stifling competition or to discourage enterprise and industry, the combination or monopoly is deemed to be detrimental to the public welfare and falls within the teeth of the law." Tooke and Reynolds v. Bastrop Ice and Storage Co., 172 La. 781, 135 So. 239 (1931). The original contract tends neither to stifle competition nor to discourage enterprise and industry. Nor does Williams reserve the right to fix prices; item 7 states that Corky's has that exclusive right. Williams merely sets the minimum price he is entitled to receive from Corky's. We find nothing in the Louisiana statutes pleaded by appellant which precludes en-

forcement of the original contract or of a guaranty agreement based on it.

■■ We turn to the applicability of Federal statutes. Under the Sherman Anti-Trust Act, only undue or unreasonable restraints of interstate or foreign commerce are prohibited; the "fundamental test of the reasonableness of restraint is its effect on the public; and except where a contract is on its face a violation of the act, it is necessary to look beyond the contract to all other facts and circumstances material to the particular case." 58 C.J.S. Monopolies § 23, pp. 988–989. We have noted that the original contract did not provide for Williams to fix prices of the merchandise. We find no violations of the act on the face of the original contract, and appellant has not shown by other facts and circumstances that the contract provides for an unreasonable restraint of trade. Nor has he requested special issues inquiring as to whether it does so. We find that appellant has failed to establish that the original contract was void and unenforceable because contrary to federal law and public policy and in restraint of trade. We overrule appellant's first four points.

■ Appellant's fifth, sixth and seventh points complain of the refusal by the trial court to submit appellant's requested special issues B, C and D. His requested Issue B asked whether appellant signed the guaranty agreement with the understanding that it would not become effective unless Robert C. Aitken signed it. His Issue C inquired of the jury if appellant informed A. L. "Corky" Jackson that the guaranty agreement would not become effective unless Aitken signed it. Appellant's requested Issue D asked whether Aitken informed Williams' attorney that he (Aitken) would not sign the guaranty agreement with Hatchett. Such issues are supported by the evidence, and they were timely submitted to the trial judge. Appellant contends that favorable answers to such issues would have made him en-

titled to prevail in this case because he would have thus established that his delivery of the guaranty agreement was conditioned on Robert Aitken's having joined him, which Aitken never did. We overrule these points. There is no evidence that Williams received timely notice that the delivery of the guaranty agreement was conditional. "The law is well settled that a conditional delivery of a guarantee instrument must be brought home to the obligee in order to relieve a guarantor of his obligation expressed in a guaranty agreement which he has signed." Eastman Oil Well Survey Co. v. Hamil, 416 S.W.2d 597 (Houston, Tex.Civ.App., 1967, writ ref., n. r. e.), citing cases.

Appellant's eighth point of error states that the trial court erred in rendering judgment for appellee and in overruling appellant's motion for new trial because the finding of the jury as to appellee's damages will not support a judgment against appellant. He argues that if the transactions contemplated under the original contract amounted to sales, such contract was void and unenforceable, an assertion we have already discussed. If the goods were placed with Corky's on consignment, he asserts, they still belong to Williams and the only provision requiring Corky's to pay for them was the one in paragraph 9 of the original contract, which states in part: "At the request of Williams, Corky's shall purchase and immediately pay for any item received by the store more than ninety (90) days prior to the demand * * *." Appellant points out that the record does not show that appellee requested Corky's to purchase and pay for any of the merchandise under such provision of paragraph 9; it does show that an attempt was made to return the merchandise to appellee early in 1966 prior to the filing of this suit, but that appellee refused to receive it.

■ We overrule this point. The attempted return occurred more than 120 days after Williams received the guaranty

agreement by which appellant agreed to reimburse appellee for the gross cost of appellee's goods then in possession of Corky's. Williams delivered no more items to Corky's after he received Hatchett's guaranty agreement. Appellant is not entitled to avoid the express limitation in his guaranty agreement on the merchandise which can be returned to Williams for credit: "Williams need not accept any item which has been delivered to Corky's more than 120 days prior to the delivery by the Guarantor to Williams, and Williams need not accept any item not in the same condition as when it was delivered to Corky's by Williams."

We have carefully studied the record of this cause and find that, except as will be noted in response to appellant's last point, the evidence is sufficient to support the judgment, so we overrule appellant's no evidence and "against the greater weight of the evidence" points.

Appellant's last point asserts in the alternative that if appellee is entitled to prevail, the undisputed evidence shows that Corky's was entitled to offset credits in the amount of $1,422.31. We hold that the evidence supports the verdict with respect to each of the items raised by appellant except one: the $267.31 item which appellee's undisputed evidence shows to be the estimated amount to be paid as import duty on a shipment of merchandise still being held by U. S. Customs. Appellee has paid for the merchandise, so he is entitled to be reimbursed to that extent, but he has not paid the duty and is not entitled to be reimbursed for it in view of his witness' testimony that it was Corky's responsibility to get the merchandise out of Customs. It is obvious from the record that the jury's verdict includes the $267.31 item, because the verdict awards all the appellee asked for. Under Rule 440, Texas Rules of Civil Procedure, we order that the judgment of the Trial Court be affirmed provided appellee files a remittitur of $267.31 within 14 days after the date of this opinion, otherwise, that it be reversed and remanded for new trial.

Reversed and remanded unless remittitur filed.

### On Filing of Remittitur

On December 30, 1968, we indicated by a written opinion that if appellee, Mr. C. W. Williams, would file a remittitur of $267.31 within fourteen days after the date of that opinion, the judgment of the trial court would be affirmed; that otherwise the cause would be reversed and remanded. The appellee has filed the suggested remittitur of $267.31.

Accordingly, as of this date, the judgment of the trial court in favor of the appellee, C. W. Williams, is reformed by deducting the amount of $267.31 from the judgment recovered by him and, as so reformed, is affirmed.

All of the costs of appeal will be taxed against the appellant. The Trial Court costs will be taxed as they were taxed in that court.

Reformed and affirmed.