B. SMITH CONTRACTORS,
INC., Appellant,

v.

OLSHAN DEMOLISHING CO.
and Fireman's Insurance Co.
of Newark, N.J., Appellees.

No. 01–91–00784–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

May 19, 1994.

Nancy Manderson, Houston, for appellant.

Charles E. Fitch, S. Bradley Todes, David N. Williams, James D. Cupples, Houston, for appellees.

Before HEDGES, DUGGAN and O'CONNOR, JJ.

## OPINION ON MOTION FOR REHEARING

HEDGES, Justice.

We withdraw our earlier opinion, substitute the following opinion in its stead, vacate our judgment rendered July 15, 1993, and grant appellees' motion for rehearing.

In the case before us, we must decide the effect of mutual termination of a contract on the obligations of the parties regarding payment for services rendered before termination. Appellant B. Smith Contractors (B. Smith) appeals a take-nothing judgment in its suit against Olshan Demolishing Co. (Olshan) for breach of contract. B. Smith challenges the factual and legal sufficiency of the evidence supporting the jury findings of no breach by Olshan and zero damages to B. Smith. It further asserts that the trial court erred in severing its tortious interference claim, in refusing to admit evidence of Ol-

shan's motions to convert appellant's chapter 11 bankruptcy proceeding to chapter 7, and in striking B. Smith's eleventh amended petition. We affirm the judgment of the trial court.

In the fall of 1985, the Harris County Hospital District awarded Olshan a contract to clear and prepare the site for the L.B.J. Hospital in Houston. On November 5, 1985, Olshan and B. Smith signed a $348,000 subcontract to be completed in 77 calendar days "after notice to proceed." The subcontract provided that B. Smith would be liable for $1,000 for each day that B. Smith was "delinquent in failing to complete" its work. The subcontract included all the site work—stone drain; outfall structure; retention pond; grading, compacting, and bringing in selected fill to make the building pads; erosion control; and hydromulch. B. Smith received notice to proceed on December 2, 1985.

Olshan had the initial responsibility of clearing the site. It encountered a number of problems in the removal of an existing structure. A truck terminal was supported by 140 piers with belled bottoms that were about eight feet deeper than anticipated, ending below the water table. As Olshan removed the piers, water seeped into the resulting hole. B. Smith could not properly backfill the hole with field dirt as originally specified and needed additional fill materials.

On February 13, 1986, B. Smith notified Olshan that it could not continue to perform under the terms of the subcontract. On February 14, 1986, Olshan wrote B. Smith, stating:

> This letter shall be your written notice that Olshan Demolishing Company shall take possession of the above referenced project and shall terminate the subcontract between Olshan and B. Smith Contractors, Inc., for work at the above referenced project.
>
> You have notified Olshan Demolishing Company that you are no longer able to complete the work and that you wish to terminate this subcontract. As of February 16, 1986 Olshan Demolishing Company shall take over that portion of your work under your subcontract which remains un-

completed and shall finish the work with its own resources.

The termination of this subcontract in no way relieves you of responsibility for payment of any unpayed [sic] bills and you shall be liable to Olshan for the cost to complete your work on this project as per paragraph 4 of the subcontract.

Paragraph four of the subcontract provided:

Should Subcontractor fail to perform his work properly or fail to comply with any provision of this contract or should Subcontractor fail to work on the site for three consecutive days, or more, then Olshan may, upon three (3) days' written notice to Subcontractor, terminate his contract and take possession of the premises if Subcontractor has failed for whatever reason to correct the discrepancies or errors within such time. In such event Subcontractor shall not be entitled to receive any further payment until the work has been completed, at which time the difference, if any, between the unpaid balance on this contract and the cost to complete the Subcontractor's work shall be paid to Subcontractor. Olshan shall be the sole judge as to whether the Subcontractor's work has been properly performed and shall be guided by generally accepted practices among the trade. Should the cost of completion by Olshan exceed the amount remaining due to Subcontractor, Subcontractor will pay Olshan such deficiency.

On February 17, 1986, Olshan and B. Smith signed a letter agreement confirming the discontinuance of B. Smith on the job. The agreement also provided that Olshan would lease two bulldozers and one front-end loader for $42.00 per hour for each machine from B. Smith, would retain two operators at an hourly rate, and would purchase diesel fuel at $0.85 per gallon for the rented equipment. Olshan paid B. Smith approximately $30,000 under this second contract. Olshan completed B. Smith's original subcontract obligation on March 5, 1986.

■ In point of error five, B. Smith asserts that there is no legal basis to support the denial of damages. In deciding a no evidence point, we consider only the evidence and inferences tending to support the finding

and disregard all evidence and inferences to the contrary. *Sherman v. First Nat'l Bank,* 760 S.W.2d 240, 242 (Tex.1988); *Otis Elevator Co. v. Joseph,* 749 S.W.2d 920, 923 (Tex. App.—Houston [1st Dist.] 1988, no writ). If there is more than a scintilla of evidence to support the finding, we must overrule the no evidence point of error. *Sherman,* 760 S.W.2d at 242.

In point of error six, B. Smith attacks the sufficiency of the evidence to support the jury's denial of damages. We interpret B. Smith's point of error and the supporting argument in its brief to amount to an assertion that the jury findings of no breach by Olshan and zero damages to B. Smith are against the great weight and preponderance of the evidence.

■ In considering a factual insufficiency point of error, we must consider and weigh all the evidence. We should set aside a verdict only if it is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). In order to recover against Olshan for breach of contract, B. Smith must establish 1) the existence of a contract, 2) Olshan's breach of the contract, and 3) damages.

■ The parties do not dispute the existence and terms of the initial subcontract dated November 5, 1985. Their disagreement centers on whether, after the cessation of its services in February 1986, B. Smith was entitled to payment for work performed before that date. B. Smith argues that because the jury found (1) the subcontract was mutually terminated, (2) B. Smith did not breach the subcontract, and (3) Olshan's cost to complete was not in excess of B. Smith's subcontract, B. Smith was entitled to receive the amount of the accrued billings up to its termination. B. Smith relies on *McDonald v. Watkins,* 353 S.W.2d 905 (Tex.Civ.App.—Fort Worth 1962, no writ), and *Eastman Oil Well Survey Co. v. Hamil,* 416 S.W.2d 597 (Tex.Civ.App.—Houston 1967, writ ref'd n.r.e.), for the proposition that because the subcontract was mutually terminated, without breach on its part, B. Smith is entitled to

payment under the subcontract for work completed before termination.

In *McDonald,* the defendant sold 2,000 chickens to the plaintiff. The parties agreed that the defendant would purchase all the eggs produced from the chickens at a price of $.60 per dozen for an eight-month period. The contract did not prescribe when the defendant would pay the $.60 per dozen. The parties disagreed on the payment scheme: the defendant paid a lesser, market-driven price, intending to defer full payment until the end of the contract; the plaintiff demanded $.60 per dozen upon each delivery. Because he was losing money, the plaintiff sold the chickens before the end of the eight-month period. The evidence shows that the defendant told him "[to] do whatever you want with the chickens" and to "sell them or do whatever you want to." *McDonald,* 353 S.W.2d at 907. Although the defendant denied having consented to the sale of the flock and the plaintiff's resulting inability to make further egg deliveries, the jury found that he did agree to the sale of the chickens. The appellate court held that the defendant owed the plaintiff the difference between $.60 per dozen and the amount paid for eggs delivered prior to the mutual abandonment of the contract. *Id.* at 907–909.

In *Eastman,* the parties signed a one-year contract whereby Eastman would provide management services and capital to Pipeline in return for a 20 percent interest in Pipeline's profits. Hamil guaranteed Pipeline's performance. The contract provided for termination upon mutual agreement of the parties. *Eastman,* 416 S.W.2d at 598–99. Because of the loss of a key patent, the contract soon became unprofitable for Eastman. By mutual agreement, the parties terminated the contract well before its expiration date. Eastman sued Hamil on his guaranty for expenses it had advanced to Pipeline. *Id.* at 599–601. The court of appeals held that the termination agreement did not release Pipeline's obligation to repay Eastman. *Id.* at 605. It also found no evidence that Eastman breached the contract. *Id.* at 604.

We agree with the principles announced in *Eastman* and *McDonald* courts. Before termination of the contract, B. Smith's right to

payment on work performed had already accrued. Similarly, however, Olshan's right to offset for failure to perform properly, had also accrued. The jury findings that the parties mutually terminated the subcontract and that B. Smith had not breached its agreement do not alter those rights. Implicit in these findings is that B. Smith did not properly perform under the contract. Therefore, B. Smith is entitled to payment for services rendered before termination only if it can establish that Olshan breached its obligation to pay by withholding payment on work that was properly performed by B. Smith.

The subcontract before us allowed Olshan to terminate the contract, take possession of the premises, and offset its costs if (1) B. Smith failed to perform its work properly, (2) B. Smith failed to comply with any provision of the contract, or (3) B. Smith failed to work on the site for three consecutive days. Moreover, the subcontract specifically provided that "Olshan shall be the sole judge as to whether [B. Smith's] work has been properly performed." In *McDonald,* the parties had not provided for termination and offset (partial payment) in the event of voluntary, mutual termination. The *McDonald* court held, "In view of such evidence and the aforesaid jury finding there is shown a mutual abandonment of further performance under the contract, which would leave rights of parties already accrued under contract to be determined by its terms." *McDonald,* 353 S.W.2d at 908.

■ We now must decide whether Olshan breached its agreement to pay. B. Smith challenges the legal and factual sufficiency of the evidence to support the jury finding that Olshan did not breach the subcontract. First, we consider the legal sufficiency challenge by reviewing only the evidence in support of the jury finding. Olshan presented a letter to the architect and testimony indicating the necessity by Olshan to redo certain work previously performed by B. Smith. The jury heard testimony from representatives of Olshan that much of the work "completed" by B. Smith before February 17 had to be completely redone, and that Olshan was required to complete B. Smith's subcontract

obligations. Olshan introduced into evidence a schedule of costs reflecting that it expended $484,392 to complete B. Smith's subcontract. We find that this represents more than a scintilla of evidence to support the jury finding that Olshan did not breach the subcontract. Accordingly, we overrule point of error five.

■ Next, we consider the factual sufficiency challenge by reviewing and weighing all the evidence. The evidence of B. Smith's performance prior to termination was conflicting. In addition to the above evidence which supported B. Smith's failure to perform, B. Smith introduced controverting testimony supporting satisfactory performance. The testimony indicated quantities and percentages completed by B. Smith, as approved by the architect in accordance with the contract. B. Smith also presented evidence that Olshan was paid $30,102.00 for B. Smith's work prior to termination.

We agree with Olshan's contention that it is entitled to offset its cost to complete the subcontract work under paragraph four of the subcontract if B. Smith failed to perform. After reviewing the conflicting evidence, we affirm the jury finding. It is not so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. Accordingly, we overrule point of error six.

Points of error one, two, and four relate to B. Smith's chapter 11 bankruptcy proceedings. After the termination of the subcontract, five claimants filed lawsuits against B. Smith for nonpayment. B. Smith filed a chapter 11 proceeding in bankruptcy on September 1, 1987. On June 29, 1988, Olshan moved to convert the proceedings to chapter 7. On March 30, 1990, after buying another creditor's claim against B. Smith, Olshan again moved to convert the proceedings to chapter 7. In the paragraphs struck or severed from its tenth amended petition, B. Smith alleged that Olshan's motions to convert its bankruptcy proceedings to chapter 7 were intended to tortiously interfere with its business relations, thereby putting it out of business.

■ In point of error one, B. Smith asserts that the trial court erred in striking all allegations relating to Olshan's bankruptcy proceedings motions. B. Smith maintains that the trial court struck the allegations "pursuant to Special Exceptions filed by Defendants" and refers this Court to its motion for rehearing and tenth amended petition. Olshan's special exceptions are not included in the transcript. We hold that B. Smith waived this point of error because there is nothing in the record for us to review. A party asserting error has the responsibility to see that a sufficient record is presented to show error requiring reversal. TEX.R.APP.P. 50(d).

■ In point of error two, B. Smith asserts that the trial court erred in severing its claim of tortious interference with business relations against Olshan two weeks before trial after a hearing on "Pending and Unresolved Matters." B. Smith complains that "[t]here was no Motion for Severance set out as pending at that hearing" and argues that this action is not a severable and independent cause of action because it shares common facts and issues with the underlying lawsuit.

■ Appellees counter that because it did not bring forward a statement of facts from that hearing for this Court's review, B. Smith has waived this point of error. We agree. In the absence of a record, we must presume that the trial court found the facts necessary to support its order. *See Commercial Credit Corp. v. Smith*, 143 Tex. 612, 187 S.W.2d 363, 365 (1945).

We overrule point of error two.

■ In point of error four, B. Smith asserts that the trial court erred in excluding evidence of its bankruptcy petition, Olshan's motions in bankruptcy court, and the lawsuits filed against it after the subcontract was terminated. This evidence is relevant only to B. Smith's claim for tortious interference. Because the severance of that cause of action was proper, the trial court did not err in excluding this evidence.

■ Further, B. Smith has not shown that it was harmed by the exclusion of this

evidence. A judgment will not be reversed based on the exclusion of evidence unless it is shown that the trial court's ruling was in error and that error caused or probably did cause an improper judgment. *GT & MC, Inc. v. Texas City Refining, Inc.*, 822 S.W.2d 252, 257 (Tex.App.—Houston [1st Dist.] 1991, writ denied). B. Smith has failed to make such a showing. We overrule point of error four.

In point of error three, B. Smith complains that the district clerk included the eleventh amended petition in the transcript as its live pleadings. The eleventh amended petition was struck in a pretrial conference, and the parties proceeded on the tenth amended petition as modified by the trial court's order on pretrial matters. At oral argument, B. Smith's counsel agreed to supplement the record with the tenth amended petition. We overrule point of error three.

We affirm the judgment of the trial court.